# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

        Plaintiff,

v.

(2) Lashun Danario Robinson,

        Defendant.

Crim. No. 10-110(2) (RHK/JJK)

**ORDER AND
REPORT AND RECOMMENDATION**

Christian S. Wilton, Esq., Assistant United States Attorney, counsel for Plaintiff.

Mark D. Larsen, Esq., Lindquist & Vennum PLLP, counsel for Defendant Robinson.

JEFFREY J. KEYES, United States Magistrate Judge

This matter is before the Court on Defendant Lashun Danario Robinson's Pretrial Motion to Suppress Statements, Admissions and Answers (Doc. No. 33), Pretrial Motion for Government Agents to Retain Rough Notes (Doc. No. 34), and Pretrial Motion for Disclosure and Suppression of Evidence Derived from Wiretaps (Doc. No. 38). This Court held a hearing on the motions on August 18, 2010,[1] and received testimony from the following Government witnesses: Federal Bureau of Investigation ("FBI") Agent Jean LaPlace Jr. and Minneapolis

---

[1] On August 18, 2010, this Court issued an Order concerning various other motions and took Defendant's Pretrial Motion to Suppress Statements, Admissions and Answers (Doc. No. 33), Pretrial Motion for Government Agents to Retain Rough Notes (Doc. No. 34), and Pretrial Motion for Disclosure and Suppression of Evidence Derived from Wiretaps (Doc. No. 38), under advisement on August 25, 2010. (Doc. No. 470.)

Police Officer Roger Smith.  This Court also received several exhibits from the Government and Defendant, including Applications for the wiretap and continued wiretap with attachments, the Orders authorizing those wiretaps, an Advice of Rights Form dated April 26, 2010, FBI 302 summaries, and Minneapolis Police Department CAPRS reports.  The suppression matters were referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1.  For the reasons stated below, this Court grants Defendant's motion for disclosure of rough notes, and recommends that Defendant's suppression motions be denied.

## BACKGROUND[2]

Agent LaPlace testified that he is familiar with an individual named Jarone Jackson because law enforcement obtained a Title III wiretap for Mr. Jackson's phone, and a wiretap extension, in relation to this case.  (Tr. 6.)  Prior to the application for the wiretap on Mr. Jackson's phone, law enforcement used a cooperating confidential reliable informant ("CRI") to make multiple controlled purchases of heroin and cocaine from him.  (Tr. 6.)  And during the purchases, law enforcement used surveillance for the purposes of determining who Mr. Jackson's customers were, who was with Mr. Jackson during the buys, and

---

[2]     The following summary is based on Agent Jean LaPlace and Officer Roger Smith's testimony provided at the August 18, 2010 hearing, and the hearing exhibits.  Agent LaPlace has been an FBI agent for fifteen years, and for a five-year period he was assigned to the Violent Offender Task Force ("VOTF") where he worked on gang and drug cases.  (Doc. No. 76, 8/18/10 Hearing Transcript ("Tr.") 5.)  Officer Smith has been a Minneapolis police officer for seventeen years, and is currently assigned to the FBI VOTF.  (Tr. 70.)

where he went after the drug deals.  (Tr. 6-7.)  The reason why law enforcement wanted to see where Mr. Jackson went after the drug deals was to determine whether he went to meet with either his supplier or other customers.  (Tr. 7.)  The goal in investigating Mr. Jackson was not only to gain evidence to prosecute him, but to learn his sources of supply.  (Tr. 7.)

According to Agent LaPlace's testimony, neither the CRI nor the law-enforcement officials learned who Mr. Jackson's sources and customers were using the CRI and the surveillance.  (Tr. 7-8.)  And the information that the CRI provided to law enforcement was not enough for law enforcement to then identify Mr. Jackson's sources and all of his customers.  (Tr. 8.)  Agent LaPlace later testified on cross-examination, however, that prior to the submission of the wiretap application, law enforcement was able to identify some of the sources. (Tr. 47.)  But they did not know the exact role of the sources, nor did they know the sources' colleagues. (Tr. 47.)  Agent LaPlace confirmed, for example, that he identified Clayton Burton in the affidavit for the wiretap as a source of cocaine that Mr. Jackson used, and that he identified "Newsome" as someone related to a Chicago-based source of heroin that Mr. Jackson used as part of his distribution scheme.  (Tr. 47-48.)  Agent LaPlace explained that the investigators were not sure whether Newsome was a source prior to issuance of the wiretap, but that they had determined through phone records that Newsome had a Chicago phone number and that Mr. Jackson had a source from Chicago. (Tr. 49.)  At the time, law enforcement did not know the scope of the conspiracy

and did not have specific evidence that would support charging the known sources or Newsome as Mr. Jackson's sources.  (Tr. 61.)

On December 12, 2008, Agent LaPlace submitted an affidavit to District Court Judge Michael J. Davis in support of an application for the Title III wiretap for a target telephone known to be Mr. Jackson's cellular telephone.  (Tr. 8-9; Gov't Hr'g Ex. 1.)  Agent LaPlace explained at the hearing that his affidavit stated the probable cause that law enforcement had for the wiretap and the goals of the investigation.  (Tr. 12.)  Agent LaPlace testified that the officers had enough evidence, including the controlled buys, to arrest Mr. Jackson, but they chose not to do so because previously, upon arrest in a different case, Mr. Jackson invoked his *Miranda* rights and did not want to talk to the police officers, and therefore he was likely to do the same again.  (Tr. 12.)  In addition, the officers did not arrest Mr. Jackson because if Mr. Jackson was arrested, they would then not be able to determine who Mr. Jackson's sources of supply were.  (Tr. 12-13.)[3]

---

[3]	On cross-examination, Defendant's attorney pointed out that Mr. Jackson had been arrested previously on December 27, 2006, and Agent LaPlace acknowledged that a police report connected with that arrest reflected that Mr. Jackson had stated that he wanted to cooperate with law enforcement and that he wanted to speak and work with the reporting officer for consideration for his case.  (Tr. 50-52; Def. Hr'g Ex. 3.)  Agent LaPlace admitted that he did not state in either affidavit in support of the wiretap that Mr. Jackson had a history of wanting to cooperate.  (Tr. 52.)  On re-direct, Agent LaPlace explained, however, that he did not include everything that Mr. Jackson had ever said every time he was arrested in his affidavit, and that to his knowledge, when Mr. Jackson said that he would cooperate in December 2006, he in fact did not cooperate, did not provide his sources, and did not make buys to help law enforcement, even though he was given the chance to do so.  (Tr. 59-60.)

As to necessity, Agent LaPlace provided examples of why the physical surveillance that the officers had performed was difficult and did not give them Mr. Jackson's sources or all of his customers. (Tr. 13-14.) Specifically, Mr. Jackson engaged in certain counter-surveillance techniques, such as: (1) changing the location to meet the CRI when the CRI was already en route; (2) meeting the CRI in an alley and then moving behind a garage area so they could not be seen; and (3) arranging to meet the CRI in a certain location, changing the location, and then picking up the CRI in his vehicle, driving on a one-way street and turning as if to look for law enforcement, and then dropping the CRI off a couple of blocks from where she was originally picked up. (Tr. 13-14.) In addition, placing a tracking device on Mr. Jackson's vehicle might not have been helpful because sometimes he would walk to meet the CRI, and he used different vehicles at times to make his controlled purchases or deliveries. (Tr. 18.) Also, the officers did not issue grand jury subpoenas because (1) they did not know Mr. Jackson's sources of supply; (2) they did not know all of his customers; and (3) even if they did know some individuals involved, issuing grand jury subpoenas would tip them off that there was an ongoing investigation, and some of them might decide to invoke their right to not incriminate themselves. (Tr. 14.)

In addition, based on Agent LaPlace's conversations with his partners, Officer Burns and Officer Tim Costello, and with the CRI, Officer LaPlace determined that the CRI did not know who Mr. Jackson's sources of supply were

and did not know how Mr. Jackson was getting his drugs into Minnesota. (Tr. 15-16.) Agent LaPlace explained that it would have been difficult to get an undercover police officer to meet with Mr. Jackson because he had a tight circle of friends. (Tr. 16-17.) And even if they had tried using an undercover officer, it would not have been fruitful because Mr. Jackson would not have told the undercover officer who his sources of supply were. (Tr. 17.) Further, even though previous search warrants had been conducted at Mr. Jackson's residence and narcotics were found, Mr. Jackson did not thereafter cooperate with law enforcement, and the officers were not able to determine who his source of supply was and who all of his customers were from the previous search warrants. (Tr. 17.) Finally, the officers did not conduct any trash searches because, as Agent LaPlace explained, officers use those to get probable cause to do a search warrant for a residence, and here, because they did not want to execute search warrants, the trash searches would not have been helpful in determining Mr. Jackson's sources or customers. (Tr. 17-18.)

On December 12, 2008, Judge Davis signed an Order authorizing interception of communications and an Order to the service providers to assist in the interception as to the target telephone. (Tr. 9; Gov't Hr'g Exs. 2, 3.) Once Judge Davis signed the Orders, Assistant United States Attorney Christian S. Wilton filed them under seal, and Agent LaPlace, Officer James Burns, and Mr. Wilton held a meeting at the VOTF office with all law-enforcement officers who were going to be monitoring or working on the case. (Tr. 10.) Agents

LaPlace and Burns explained to them the background of the case, and Mr. Wilton

"did a minimization" for the people who were going to be monitoring or working

on the Title III wiretap, which means he explained the rules about what the

agents could listen to and could not listen to.  (Tr. 10-11.)  He also provided a

Minimization of Interception of Wire Communications Memorandum to all of the

agents who were going to monitor the wiretap so that they would know the rules.

(Tr. 11; Gov't Hr'g Ex. 4.)

The officers then began intercepting on Mr. Jackson's phone on December

15, 2008, and the interceptions continued until January 13, 2009, when the

December 12, 2008 Order expired.  (Tr. 11.)  After approximately twenty days in

on intercepting Mr. Jackson's phone, Agent LaPlace began preparing an affidavit

in support of a thirty-day extension on the wiretap.  (Tr. 18-19.)  On January 13,

2009, Agent LaPlace submitted an affidavit to District Court Judge James M.

Rosenbaum in support of the wiretap extension at Judge Rosenbaum's home

during the evening hours.  (Tr. 19; Gov't Hr'g Ex. 5.)  The information contained

in the affidavit is much the same as that provided in the earlier affidavit, with

some additions, including the identification of one of Mr. Jackson's sources.

(Tr. 22.)  Agent LaPlace, however, believed there to be multiple sources for

Mr. Jackson, and they had not yet identified the others.  (Tr. 22.)  On that same

day, Judge Rosenbaum signed an Order authorizing the continued interception

of communications and an Order to the service providers to assist in the

continued interception as to Mr. Jackson's cellular telephone.  (Tr. 19-20; Gov't

Hr'g Exs. 6, 7.)  The application and Orders were filed with the Court the next day.  (Tr. 20.)  The wiretap continued until February 1, 2009, which was the day that the officers arrested Mr. Jackson.  (Tr. 21.)  Even though the officers did not yet learn the entire scope of the conspiracy solved, they chose to arrest Mr. Jackson at that time because the investigation revealed that Mr. Jackson was transporting a large amount of narcotics and they did not want the narcotics to be sold on the street.  (Tr. 22.)

During the time that the wiretap was in effect, the officers continued to conduct surveillance and they were ultimately able to utilize an undercover officer in making a hand-to-hand buy from Mr. Jackson.  But the investigators did not identify all of Mr. Jackson's sources through the wiretap, surveillance, or the controlled buy, nor did they believe that they had identified the full scope of Mr. Jackson's conspiracy.  (Tr. 18, 57.)  Also during that time, the officers made ten-day reports to Judge Davis to explain to the judge what was happening by way of communications in the case.  (Tr. 57, 58.)  They did not mention in those reports that they had been successful in having their undercover officer make a hand-to-hand buy from Mr. Jackson.  (Tr. 57.)  Agent LaPlace explained that the Court previously knew that buys had been made from Mr. Jackson through their CRI, and therefore the issue was not whether they could make buys from Mr. Jackson, but instead whether they could identify his source of supply and his distribution network.  (Tr. 58.)  And here, the undercover officer did not learn from

Mr. Jackson who his sources were or how he was transporting drugs into the state. (Tr. 58-59.)

Upon Mr. Jackson's arrest and the termination of the wiretap, the officers presented a sealing application and sealing order to United States District Court Judge Donovan W. Frank. (Tr. 23; Gov't Hr'g Exs. 8, 9.) Judge Frank signed the documents and Agent LaPlace sealed the wiretap discs in front of him. (Tr. 23.)

Based on the information obtained through the wiretap investigation, Agent LaPace was able to identify Defendant Robinson as being connected to Mr. Jackson's conspiracy. (Tr. 23-24.) The officers then learned through his driving record that Defendant Robinson did not have a driver's license, so they set up surveillance near his residence to see if they could observe him driving. (Tr. 24.) On March 2, 2009, officers observed Defendant Robinson get in a vehicle and drive, and the officers placed him under arrest for driving after suspension. (Tr. 24.)

After his arrest, at the direction of Officer Burns, the officers transported Defendant Robinson to an interview room at the VOTF office so that Agent LaPlace and Officer Burns could interview him regarding Mr. Jackson and the wiretap. (Tr. 25, 41.)[4] Agent LaPlace and Officer Burns were both present with

_____

[4]     Agent LaPlace testified that when a Minneapolis Police Officer arrests someone for driving after suspension, the officer could take him or her to jail, issue him or her a citation, or take him or her for an interview. (Tr. 66.) Although, typically, when someone is arrested for driving with a suspended license he is cited and released, in this instance the law-enforcement officers

Defendant Robinson for the interview.  (Tr. 26.)  After the officers obtained some background information from Defendant Robinson, Officer Burns read him the *Miranda* warnings from a Minneapolis Police Department Advice of Rights card. (Tr. 26, 42.)  Defendant Robinson agreed to speak with law enforcement and proceeded to make a statement.  (Tr. 26-27.)  The interview lasted approximately an hour.  (Tr. 41.)  At no time during the interview did Defendant Robinson ask for a lawyer.  (Tr. 27.)  Defendant Robinson appeared to understand the questions that the officers asked, and he gave appropriate responses to the questions presented.  (Tr. 28.)  At no time did the officers threaten or yell at Defendant Robinson.  (Tr. 28.)  Near the end of the hour-long interview, Defendant Robinson indicated that he did not want to talk anymore, and at that point, the officers ended the interview.  (Tr. 27.)  At no time prior to this, however, did Defendant Robinson indicate that he wanted to stop speaking.  (Tr. 27.) Once the interview ended, the officers gave Defendant Robinson a ticket and released him.  (Tr. 29.)

After the interview, Agent LaPlace drafted an FBI 302, which reflects what occurred during the March 2, 2009 interview.  (Tr. 42; Def. Ex. 2.)  Near the end of this FBI 302, Agent LaPlace reported that "Robinson advised that he would buy half ounces and ounces from [Mr. Jackson]."  (Tr. 43-44.)  Agent LaPlace testified that when he stated "ounces and half ounces" he believed Defendant

---

wanted to speak with Defendant Robinson about Mr. Jackson and the conspiracy.  (Tr. 41.)

Robinson was referring to cocaine or crack cocaine, even though he did not note that in his FBI 302. (Tr. 44.) Agent LaPlace testified that there are rough notes that were prepared in relation to the March 2009 interview, but that he knows that his rough notes do not specifically reference cocaine or crack cocaine. (Tr. 39, 44.)

Thereafter, the investigation into Mr. Jackson and the conspiracy continued. (Tr. 29.) In April 2010, Defendant Robinson was indicted[5] and a warrant issued for his arrest. (Tr. 29.) On Friday, April 23, 2010, officers found and arrested Defendant Robinson at approximately 8:15 p.m. and transported him to the Hennepin County Jail. (Tr. 29-30, 62.) On Monday, April 26, 2010, Agent LaPlace and Officer Smith transported Defendant Robinson from the Hennepin County Jail to the Federal District Courthouse in St. Paul, Minnesota, for his first appearance. (Tr. 30.) Agent LaPlace drove his FBI vehicle, and Officer Smith sat next to Defendant Robinson in the back seat. (Tr. 31, 71.) Prior to the transport, Agent LaPlace handed Officer Smith an FBI Advice of Rights Form. (Tr. 72.) During the transport, Officer Smith read Defendant Robinson his *Miranda* rights verbatim from the Advice of Rights Form and Defendant agreed to speak to them. (Tr. 30, 72.) When Officer Smith first began reading the Advice of Rights Form to Defendant, he noted in the top right corner

---

[5] Defendant Robinson was indicted for Conspiracy to Distribute Cocaine Base "Crack" in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A), and 846. (*See* Doc. No. 1.)

of the form that the time was "09:43 [a.m.]."  (Tr. 35, 72; Gov't Hr'g Ex. 15.)  Once

Officer Smith finished reading the rights to Defendant Robinson and Defendant

agreed to speak, Officer Smith signed his name as a witness on the Advice of

Rights form and noted near his signature that it was "09:44 [a.m.]"  (Tr. 33, 63,

64, 73.)  Agent LaPlace did not sign the form at that time because he was driving

the vehicle, and Defendant Robinson did not sign the form at that time because

he was handcuffed behind his back for the transport.  (Tr. 34, 73.)   Agent

LaPlace then interviewed Defendant Robinson for approximately fifteen minutes.

(Tr. 31.)  During this interview, Defendant did not ask for an attorney and did not

indicate that he wished to stop speaking.  (Tr. 31, 73.)  Defendant Robinson

appeared to understand the questions asked, and gave appropriate responses.

(Tr. 32.)  Neither officer threatened Defendant Robinson nor yelled at him during

the interview.  (Tr. 32.)

Once they arrived at the United States Marshal's Office, Agent LaPlace

signed the Advice of Rights Form as a witness, left the Advice of Rights Form in

his vehicle, and then transported Defendant Robinson from the vehicle to the

United States Marshal's Office.  (Tr. 63.)  When they arrived at the sally port at

the St. Paul Courthouse, Defendant Robinson stated that he wanted to stop

talking.  (Tr. 74.)  From that point on, Agent LaPlace and Officer Smith did not

ask Defendant Robinson any further questions.  (Tr. 74.)  Agent LaPlace then

brought the Advice of Rights Form to Defendant's initial appearance, and after

the initial appearance, he presented the Advice of Rights Form to Defendant to

have him sign it, but he refused.  (Tr. 63.)  Agent LaPlace then noted "Refused to Sign" on the form.  (Tr. 33-34; Gov't Hr'g Ex. 15.)[6]

After this April 2010 interview, Agent LaPlace drafted an FBI 302, which reflects what occurred during the interview.  (Def. Ex. 1.)  In the FBI 302, Agent LaPlace reported that Defendant Robinson had stated that he was selling heroin, but denied that he had any involvement with cocaine.  (Tr. 38-39.)  Agent LaPlace testified at the hearing that this statement was consistent with his recollection.  (Tr. 39.)  Later in the FBI 302, Agent LaPlace stated that "Robinson did admit to small amounts of cocaine."  (Tr. 39.)  Agent LaPlace confirmed at the hearing that Robinson admitted "to small amounts of cocaine," and that Robinson did not admit to trafficking in cocaine.  (Tr. 39.)  Agent LaPlace testified that he should have rough notes that were prepared in relation to the April 2010 interview.  (Tr. 39.)

After the hearing, the Government submitted the agents' rough notes that pertain to the above-mentioned interviews with Defendant Robinson to the Court for *in camera* review.

## DISCUSSION

Defendant argues that his motion to suppress evidence obtained pursuant to a Title III wiretap application and continuation, and motion to suppress

---

[6]     Because the notation "09:44" appears next to the notation "Refused to sign," the document appears to reflect that Defendant Robinson refused to sign the form at 9:44 a.m., while the officers transported him to federal court.  (Tr. 36-37.)  However, as stated above, the officers' testimony explained that this is not what those notations actually reflected.

statements obtained should be granted because: (1) the affidavits submitted to the Court in support of the wiretap and the continuation contained misstatements and material omissions pertaining to the Government's necessity showing; (2) the good-faith exception to the exclusionary rule does not apply with regard to the wiretap; and (3) Defendant's statements to law enforcement should be excluded as fruit of the illegal wiretap.[7]  Defendant Robinson also contends that the Government should immediately produce the rough notes created by the case agents in connection with Defendant's March 2009 and April 2010 statements based on Rule 16 and the *Brady* doctrine. The Government disagrees, asserting that (1) the affidavits submitted in support of the application for the wiretap orders established the requisite necessity for the issuance of the orders; (2) Agent LaPlace's affidavits were truthful and accurate; and (3) Defendant Robinson has not made a showing that he should receive or is entitled to the rough notes at issue.  This Court addresses each argument in turn.

**I.  Defendant's Motion to Suppress Evidence of Electronic Surveillance**

Section 2518 of Title 18 of the United States Code sets forth the "necessity requirement," noting that each application for interception of wire communication must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably

_____

[7]  Defendant Robinson originally asserted in his pre-hearing motion that his March 2009 and April 2010 statements should be suppressed on the grounds of voluntariness or issues surrounding the custodial nature of the Government's interviews.  In his post-hearing brief, Defendant Robinson withdrew his motion to suppress statements on those grounds.

appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). "The necessity requirement of 18 U.S.C. § 2518 ensures 'that wiretaps are not routinely employed as the initial step in an investigation.'" *United States v. Jackson*, 345 F.3d 638, 644 (8th Cir. 2003) (quoting *United States v. Thompson*, 210 F.3d 855, 858-859 (8th Cir. 2000), and *United States v. Maxwell*, 25 F.3d 1389, 1394 (8th Cir. 1994)).

The necessity requirement is met where other investigative tools reasonably appear to be unlikely to sufficiently expose the full extent of a conspiracy—in terms of members and in terms of scope or drug quantity—to obtain convictions against those conspirators. *See Maxwell*, 25 F.3d at 1394 (citing *United States v. Macklin*, 902 F.2d 1320, 1327 (8th Cir. 1990)); *see also United States v. Smith*, 909 F.2d 1164, 1166 (8th Cir. 1990) (concluding that necessity was established where the affidavit demonstrated that traditional procedures failed to expose the full extent of the conspiracy and all conspirators); *United States v. O'Connell*, 841 F.2d 1408, 1414-15 (8th Cir. 1988) (same). "A facially sufficient affidavit, however, may be challenged on the ground that it includes deliberate or reckless falsehoods, *Franks v. Delaware*, 438 U.S. 154 (1978), and this rule has been extended to allow challenges to affidavits based on alleged deliberate omissions. *E.g., United States v. Dennis*, 625 F.2d 782 (8th Cir. 1980)." *United States v. Reivich*, 793 F.2d 957, 960 (8th Cir. 1986).

District Court Judge Michael J. Davis and District Court Judge James M. Rosenbaum issued the Orders authorizing the interception of wire

communications and the continuation of the interception of wire communications that are the subject of Defendant's motion on December 12, 2008, and January 13, 2009, respectively. The Orders described the subject matter of calls to be intercepted, indicated the objectives of the wiretap investigation, provided a maximum duration period, and stated conditions upon which interceptions should be terminated. In issuing the Orders, the District Court found that, based on Agent LaPlace's affidavit, there was probable cause to believe that Jarone Nepthali Jackson and Lashun Danaro Robinson, as well as others, had violated various federal laws prohibiting the possession, distribution, and trafficking of controlled substances. The Court also made specific findings that the necessity requirement of 18 U.S.C. § 2518 was met: "[I]t has been established that normal investigative procedures have been tried and have failed, reasonably appear to be unlikely to succeed if tried, or are too dangerous to employ[.]" (Gov't Hr'g Ex. 2 ¶ c; Gov't Hr'g Ex. 6 ¶ c.)

Recordings obtained as a result of the above wiretap and continuation have been sealed pursuant to sealing application dated February 3, 2009 (Gov't Hr'g Ex. 8), and Sealing Order dated February 3, 2009. (Gov't Hr'g Ex. 9.) And monitoring of intercepted phone conversations was subject to minimization requirements outlines in a memorandum prepared by an Assistant United States Attorney in connection with the December 12, 2008 interception Order. (Gov't Hr'g Ex. 4.)

The application for the Order authorizing the December 2008 wiretap was based on a 56-page affidavit of Agent LaPlace, and the application for the continuation Order authorizing the January 2009 wiretap continuation was based on a 30-page affidavit of Agent LaPlace.  The affidavits detailed the extensive investigation of the drug-trafficking distribution scheme, including the evidence collected concerning Mr. Jackson's activity as a member in that drug-trafficking distribution scheme.  The affidavits also explain that the Government sought the wiretap authorization because it sought to obtain direct evidence that would convince a jury beyond a reasonable doubt of:

> []  The full scope, extent, and personnel involved in the narcotic[cs] trafficking conspiracy described in this affidavit;
>
> []  The identity and role of all suppliers of controlled substances to the known conspirators and their identified and unidentified co-conspirators;
>
> []  The identity and role of the main customers of the known and unknown narcotics traffickers;
>
> []  The management and disposition of proceeds generated by this organization's narcotics trafficking activity, and the government's right to seize and forfeit assets acquired with such illegally earned proceeds; and
>
> []  The identity of other persons involved in this organization[.]

(Gov't Hr'g Ex. 1 ¶ 96; Gov't Hr'g Ex. 5 ¶ 50.)

Agent LaPlace set forth, specifically and in detail, each of the customary investigative techniques that are usually employed in an investigation of a drug-trafficking conspiracy, but which had in this case been tried and failed, or

reasonably appeared unlikely to succeed if continued or tried, or would be too dangerous to employ. These included the use of physical surveillance, grand-jury subpoenas and interviews, confidential sources (including a Confidential Reliable Informant ("CRI")), undercover agents, search warrants, interviews, jail calls, trash searches, arrests, financial investigations, electronic surveillance, mobile tracking device, and video surveillance. In addition, as stated above, Agent LaPlace testified at the motions hearing on August 18, 2010, as to why the wiretap interception was necessary and why certain other techniques appeared reasonably likely to fail.

An application to engage in electronic surveillance must be reviewed in a practical and common sense fashion and broad discretion must be accorded to the decision to authorize a wiretap. *United States v. Garcia*, 785 F.2d 214, 221 (8th Cir. 1986). The information in the supporting affidavit must present a truthful showing of probable cause. *United States v. Falls*, 34 F.3d 674, 681 (8th Cir. 1994) (citing *Franks v. Delaware*, 438 U.S. 154, 164-65 (1978)). A defendant has the burden of showing that wiretap authority was unlawfully obtained or used. *Garcia*, 785 F.2d at 222. An application may be challenged through a showing that facts included in the affidavit are false or were made with reckless disregard for the truth, or that facts were omitted with intent to mislead or in reckless disregard to whether the affidavit is misleading. *Falls*, 34 F.3d at 681.

Defendant argues that through Agent LaPlace's affidavits, the Government did not make a "full and complete statement of the facts and circumstances"

establishing probable cause and a "full and complete statement" of the other "investigative procedures [that had] been tried" and the reasons that other measures would "be unlikely to succeed," pursuant to 18 U.S.C. § 2518(1)(b), (c).  Defendant specifically takes issue with Agent LaPlace's affidavit testimony that the wiretap was necessary in part, because Mr. Jackson would not cooperate with law enforcement if he were arrested.  Defendant Robinson points out that Mr. Jackson had previously indicated to law-enforcement officers in December 2006, following his arrest for narcotics, that he wanted to "speak and work with [the reporting officer] for consideration for his case."  (Def. Hr'g Ex. 3 at 7.)  Defendant asserts that it was a material omission to not include this information in the affidavits presented to the issuing judges.  Further, Defendant asserts that Mr. Jackson's willingness to cooperate was substantiated when upon his arrest in relation to this case he began cooperating in the Government's investigation.[8]

Agent LaPlace testified in his December 2008 affidavit that "during this investigation, [Mr. Jackson] was arrested and refused to cooperate with

---

[8]      Defendant contends that there was no necessity for the wiretap, and that this is supported by the fact that when the Government arrested Mr. Jackson and made him a good deal, he agreed to cooperate against others.  This argument is meritless.  The Government is not required to look into a crystal ball and read whether a defendant will cooperate with law enforcement in the future in order to determine whether a wiretap is necessary.  Necessity is analyzed in light of the facts known at the time that the affidavits are submitted to the Court, not after the benefit of learning how the case unravels after arrests and offers for cooperation have been made.

investigators, invoking his right to speak with his lawyer[,]" and "[Mr. Jackson]

has been arrested and convicted several times for controlled substance crimes in

the past, but has never cooperated with law enforcement officers against other

defendants or co-conspirators."  (Gov't Hr'g Ex. 1 at ¶ 117.)  In his January 2009

affidavit, Agent LaPlace stated the following:

> During the course of this wire/electronic communication interception
> [Mr. Jackson] has not been arrested.  Furthermore, [Mr. Jackson]
> has been arrested and convicted several times for controlled
> substance crimes in the past.  Rather than cooperating with law
> enforcement to obtain consideration for leniency in regards to his
> criminal case, [Mr. Jackson] has chosen to plead guilty to the above
> mentioned offenses to obtain a shorter prison sentence.

(Gov't Hr'g Ex. 5 at ¶ 70.)  However, Agent LaPlace had also stated that:

> Since this affidavit is being submitted for the limited purpose of
> securing authorization for the interception of wire/electronic
> communication and the interception of electronic or "text"
> messaging, I have not included each and every fact known to me
> concerning this investigation.  I have set forth only the facts that I
> believe are necessary to establish the necessary foundation for an
> order authorizing the interception of wire/electronic communication.

(Gov't Hr'g Ex. 1 ¶ 20.)  Defendant does not assert that the above statements are

false.  Instead, as stated above, he bases his argument on the omission of a

reference to Mr. Jackson's 2006 statement.

This Court agrees with the Government that not every fact known to Agent

LaPlace about Mr. Jackson must be stated in the affidavit in support of the

wiretap; however, material facts should be.  The question then becomes whether

the omission regarding Mr. Jackson's statement in 2006 that he wanted to

cooperate with law enforcement was "material" to the determination as to

whether the wiretap was necessary. This Court concludes that it was not. The reason is simple – even though Mr. Jackson made the statement at some point in time prior to the wiretap application that he wanted to speak and work with law enforcement, he never did so. After his 2006 arrest, Mr. Jackson did not provide his sources to law enforcement, and he did not cooperate in any way with them, even though law enforcement gave him the chance to do so. (Tr. 59-60.) Therefore, by Agent LaPlace omitting a reference to Mr. Jackson's 2006 comment to law enforcement in his affidavits, he was not misleading the issuing judges; in light of the fact that Mr. Jackson never cooperated, the 2006 comment was irrelevant. Furthermore, if Agent LaPlace would have included Mr. Jackson's 2006 comment in his affidavit, he more than likely would have provided the context that Mr. Jackson never in fact cooperated with law enforcement, which would have supported his assertion that the wiretap was necessary even further.

Defendant also takes issue with the fact that Agent LaPlace did not disclose in his affidavit supporting the wiretap continuance on January 13, 2009, that the Government had by that date utilized an undercover officer to attempt to make a buy from Mr. Jackson. Specifically, Agent LaPlace stated in his affidavit that "undercover officers have not been used in the course of this investigation as Jackson and/or his associates limit the individuals that they associate with[.]" (Gov't Hr'g Ex. 5 at ¶ 63.) Defendant Robinson points out that law-enforcement investigators did in fact make direct use of an undercover officer during this

period of time, albeit unsuccessfully. And the undercover officer ultimately was able to make a direct purchase of narcotics from Mr. Jackson on January 15, 2010, and the Government did not report this fact back to the issuing judge in its ten-day reports.

Presumably, Defendant's argument is that if Agent LaPlace had informed the issuing judges that the Government had utilized an undercover officer to attempt to make a buy from Mr. Jackson, or that an undercover agent had been able to make a direct purchase of narcotics from Mr. Jackson, that the issuing judges would have determined that there was no longer a necessity for the wiretap. This Court disagrees and concludes that neither omission regarding the undercover officer was material or made with the intent to mislead the issuing judges. Although it appears that Agent LaPlace's statement in his affidavit supporting the continuance of the wiretap that "undercover officers [had] not been used in the course of this investigation" was false at that time because by then law enforcement actually had utilized an undercover agent to attempt to make a buy, there is no evidence that Agent LaPlace made the statement with reckless disregard for the truth. Instead, it appears to have been negligence or a mistake on Agent LaPlace's part to not include the updated information that by this stage in the investigation a purchase by an undercover agent had been attempted, because informing the issuing judge that an undercover officer had been used without success would have only further supported a finding of necessity.

In addition, this Court concludes that the issuing judge would not have determined that there was no longer a necessity for the wiretap if he would have been informed in the 10-day reports that an undercover agent had been successful in making a buy from Mr. Jackson.  The record reflects that the undercover agent did not learn who Mr. Jackson's sources or customers were and was not able to reveal the full scope of the conspiracy through its contact with Mr. Jackson.  Therefore, the goals of the wiretap had not been attained. *See United States v. Thompson*, 210 F.3d 855, 859 (8th Cir. 2000) (stating that if "conventional investigatory techniques have not been successful in exposing the full extent of the conspiracy and the identity of each coconspirator, the necessity requirement is satisfied").

Agent LaPlace's affidavits in support of the wiretap authorizations, and the testimony of Agent LaPlace at the motion hearing, detailed the conventional investigative techniques used by law-enforcement officers before they sought the wiretap authorizations, showed the difficulties law-enforcement officers encountered, and explained why the investigative methods that were attempted failed to discover the full scope of the conspiracy.  He also established the limited use, and problems associated with, other traditional investigative techniques. There is no argument and no factual showing that the Government had uncovered the source of the drugs at issue in this case, had determined the identity of all coconspirators, or had fully discovered the nature of the conspiracy prior to expiration of the 30-day wiretap authority in this case.  And as explained

above, the misstatement and omissions in Agent LaPlace's affidavits and/or ten-day reports would not have obviated the necessity for the Title III wiretap. Therefore, this Court concludes that the Government met its statutory obligation with respect to a statement of necessity and there is no showing that the relevant affidavit statements were materially inaccurate or that the information was otherwise presented or omitted with the intent or the effect of misleading the issuing judge. For these reasons, Defendant's motion to suppress evidence obtained either directly or derivatively through the wiretaps at issue should be denied.[9]

## II.    Defendant's Motion to Suppress Statements

Defendant Robinson contends that the March 2009 and April 2010 statements he made to law enforcement should be suppressed because they are fruits of the unlawfully intercepted wire communications. Because this Court concludes that the interception of wire communications at issue was not unlawful, Defendant's motion to suppress statements should be denied.

## III.    Defendant's Motion for Disclosure of Rough Notes

Defendant Robinson argues that the Government should produce the rough notes related to his March 2009 and April 2010 interview statements because the agent's 302 reports are vague as to what illegal substance

---

[9]    Because this Court concludes that the Government met its statutory obligation with respect to a statement of necessity and there is no showing that the relevant affidavit statements were materially inaccurate or misleading, it need not address whether the "good-faith exception" adopted in *United States v. Leon*, 468 U.S. 897 (1984), applies.

Defendant Robinson was talking about and/or involved in, and vague as to the extent of his involvement. Defendant Robinson asserts that determining what substance Defendant referenced and the nature of Defendant's actions matters because it would affect what his mandatory minimum sentence might be. In addition, Defendant Robinson asserts that if the rough notes are silent as to these matters, the silence could be construed as favorable to Defendant. The Government opposes Defendant Robinson's motion citing cases supportive of the proposition that agent rough notes are not "statements" of the agent. The Government also submitted the rough notes at issue for *in camera* review.

This Court hereby grants Defendant's motion, and the Government shall disclose the agents' rough notes that relate to the March 2009 and April 2010 interviews with Defendant Robinson to Defendant. The Court makes no determination as to whether these notes contain information favorable to Defendant, whether these notes contain statements under the Jencks Act, or whether these notes are admissible at trial.

**ORDER**

**IT IS HEREBY ORDERED** that:

1.      Defendant's Pretrial Motion for Government Agents to Retain Rough Notes (Doc. No. 34), is **GRANTED**. The Government shall disclose the agents' rough notes that relate to the March 2009 and April 2010 interviews with Defendant Robinson to Defendant. The Court makes no determination as to

whether these notes contain information favorable to Defendant, whether these notes contain statements under the Jencks Act, or whether these notes are admissible at trial.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that:

1. Defendant's Pretrial Motion to Suppress Statements, Admissions and Answers (Doc. No. 33), be **DENIED**; and

2. Defendant's Pretrial Motion for Disclosure and Suppression of Evidence Derived from Wiretaps (Doc. No. 38), be **DENIED**.

Date: September 16, 2010

_s/Jeffrey J. Keyes_
JEFFREY J. KEYES
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **September 30, 2010**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within **14 days** after service thereof. All briefs filed under this rule shall be limited to 3500 words. A judge shall make a de novo determination of those portions of the Report to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.